IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| ELLEN TURNER-CLEWIS, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 4:20-CV-372-A |
| | § | |
| ANDREW SAUL, | § | |
| COMMISSIONER OF SOCIAL | § | |
| SECURITY. | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE
AND
NOTICE AND ORDER**

This case was referred to the United States Magistrate Judge pursuant to the provisions of Title 28, United States Code, Section 636(b). The Findings, Conclusions, and Recommendation of the United States Magistrate Judge are as follows:

**FINDINGS AND CONCLUSIONS**

**I.   STATEMENT OF THE CASE**

Plaintiff Ellen Turner-Clewis ("Turner-Clewis") filed this action pursuant to Sections 405(g) and 1383(c)(3) of Title 42 of the United States Code for judicial review of a final decision of the Commissioner of Social Security denying her claims for a period of disability and disability insurance benefits ("DIB") under Title II. Turner-Clewis protectively filed her application in May 2017, alleging that her disability began on November 17, 2016. (Transcript ("Tr.") 10; *see* Tr. 156-57.) After her application was denied initially and on reconsideration, Turner-Clewis requested a hearing before an administrative law judge ("ALJ"). (Tr. 10; *see* Tr. 61-101.) The ALJ held a hearing on April 22, 2019 and issued a decision on May 13, 2019 denying Turner-Clewis' application for benefits. (Tr. 7–60.) On February 20, 2020, the Appeals Council denied

1

Turner-Clewis' request for review, leaving the ALJ's May 13, 2019 decision as the final decision of the Commissioner. (Tr. 1-4.) Turner-Clewis subsequently filed this civil action seeking review of the ALJ's decision.

## II. STANDARD OF REVIEW

Disability insurance is governed by Title II, 42 U.S.C. § 404 *et seq.*, and numerous regulatory provisions. *See* 20 C.F.R. Pt. 404. The SSA defines "disability" as a "medically determinable physical or mental impairment" lasting at least twelve months that prevents the claimant from engaging in substantial gainful activities. 42 U.S.C. §§ 423(d)(1), 1382c(a)(3)(A).

To determine whether a claimant is disabled, and thus entitled to disability benefits, a five-step analysis is employed. 20 C.F.R. § 404.1520(a)(4). First, the claimant must not be presently working at any substantial gainful activity. *Id.* §§ 404.1520(a)(4)(i), (b). "Substantial gainful activity" is defined as work activity involving the use of significant and productive physical or mental abilities for pay or profit. *See id.* § 404.1510. Second, the claimant must have an impairment or combination of impairments that is severe. *Id.* §§ 404.1520(a)(4)(ii), (c); *see also Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985), *cited in Loza v. Apfel*, 219 F.3d 378, 392 (5th Cir. 2000). Third, disability will be found if the impairment or combination of impairments meets or equals an impairment listed in the Listing of Impairments ("Listing"). 20 C.F.R. Pt. 404 Subpt. P, App. 1; 20 C.F.R. §§ 404.1520(a)(4)(iii), (d).[1] Fourth, if disability cannot be found based on the claimant's medical status alone, the impairment or impairments must prevent the claimant from returning to her past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), (f). Fifth, the

---

[1] Before moving from the third to the fourth step of the inquiry, the Commissioner assesses the claimant's residual functional capacity to determine the most the claimant is able to do notwithstanding her physical and mental limitations. 20 C.F.R. §§ 404.1520(a)(4), (e), 416.920(a)(4), (e). The claimant's RFC is used at both the fourth and fifth steps of the five-step analysis. *Id.* §§ 404.1520(a)(4), 416.920(a)(4). At step four, the claimant's RFC is used to determine if the claimant can still do her past relevant work. *Id.* §§ 404.1520(a)(4)(iv) 416.920(a)(4)(iv). At step five, the claimant's RFC is used to determine whether the claimant can adjust to other types of work. *Id.* §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

2

impairment must prevent the claimant from doing any work, considering the claimant's residual functional capacity ("RFC"), age, education, and past work experiences. *Id.* §§ 404.1520(a)(4)(v), (g); *Crowley v. Apfel*, 197 F.3d 194, 197–98 (5th Cir. 1999). At steps one through four, the burden of proof rests upon the claimant to show he is disabled. *Crowley*, 197 F.3d at 198. If the claimant satisfies this responsibility, the burden shifts to the Commissioner to show that there is other gainful employment the claimant is capable of performing in spite of his existing impairments. *Id.* If the Commissioner meets his burden, it is up to the claimant to then show that he cannot perform the alternate work. *See Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000).

A denial of disability benefits is reviewed only to determine whether the Commissioner applied the correct legal standards, and whether the decision is supported by substantial evidence in the record as a whole. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *Hollis v. Bowen*, 837 F.2d 1378, 1382 (5th Cir. 1988) (per curiam). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). It is more than a mere scintilla, but less than a preponderance. *Id.* A finding of no substantial evidence is appropriate only if *no* credible evidentiary choices or medical findings support the decision. *Id.* (emphasis added). An ALJ's decision is not subject to reversal, even if there is substantial evidence in the record that would have supported the opposite conclusion, so long as substantial evidence supports the conclusion that was reached by the ALJ. *Dollis v. Astrue*, No. 4:08-CV-00503-A, 2009 WL 1542466, at *5 (N.D. Tex. June 2, 2009). This Court may neither reweigh the evidence in the record, nor substitute its judgment for the Commissioner's, but will carefully scrutinize the record to determine if substantial evidence is present. *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir. 2000); *Hollis*, 837 F.2d at 1383.

## III. ISSUES

In her brief, Turner-Clewis presents the following issues:

1. Whether there is substantial evidence to support the ALJ's residual functional capacity ("RFC") determination because the ALJ failed to properly evaluate the medical opinion evidence; and

2. Whether the ALJ erred in making his credibility assessment by failing to consider Turner-Clewis' "stellar work history."

(Plaintiff's Brief ("Pl.'s Br.") at 3, 13-25.)

## IV. ALJ DECISION

In his May 13, 2019 decision, the ALJ found that Turner-Clewis had not engaged in any substantial gainful activity since November 17, 2016, her alleged onset date of disability, and that she met the disability insured status requirements of the SSA through December 31, 2021. (Tr. 12.) At Step Two, the ALJ found that Turner-Clewis suffered from the following "severe" impairments: "multiple sclerosis, degenerative disc disease lumbar, thoracic and cervical spines, degenerative joint disease bilateral knees, and obesity." (Tr. 12 (emphasis omitted).) At Step Three, the ALJ found that Turner-Clewis did not suffer from an impairment or combination of impairments that met or equaled any section in the Listing. (Tr. 13.)

As to Turner-Clewis' RFC, the ALJ stated:

After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR [§] 404.1567(a) except the claimant can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. She can never climb ladders, ropes or scaffolds. She must be able to use a single hand-held assistive device such as a cane for ambulating distances over 20 feet or over rough or uneven terrain. She requires a sit-stand option, defined [in] this case [as] the option to stand for 5 minutes after 30 minutes of sitting. She can stay on-task to the extent consistent with job duties. She can frequently but not constantly handle and finger objects bilaterally. She must avoid all hazards such as dangerous moving machinery and unprotected heights. She must avoid extremes of heat.

4

(Tr. 13 (emphasis omitted).) Based upon this RFC assessment, the ALJ concluded that Turner-Clewis was able to perform her past relevant work as an accounting clerk or a collection clerk. (Tr. 23.) Consequently, the ALJ found that Turner-Clewis was not disabled. (Tr. 23-24.)

## V. DISCUSSION

### A. RFC Determination

As to her first issue, Turner-Clewis argues that the ALJ's RFC determination is not supported by substantial evidence because the ALJ failed to properly evaluate the medical opinion evidence. (Pl.'s Br. at 13.) Specifically, Turner-Clewis argues that the ALJ erred in finding that the opinions of Thomas H. Salmon, M.D. ("Dr. Salmon"), her treating neurologist, were unpersuasive. (Pl.'s Tr. 17.) In support, Turner-Clewis states:

> The ALJ's finding that Dr. Salmon's opinions are unpersuasive is not reasonably or logically bridged to the evidence. To begin with, the ALJ discussed evidence that pre-dated Plaintiff's diagnosis of [multiple sclerosis ("MS")] to support his finding that Dr. Salmon's opinions are not consistent with the longitudinal record. While Plaintiff does not dispute that she underwent objective testing that produced "normal" or only "mild" changes, it must be remembered that this testing was done to determine the *cause* of her lower leg symptoms, and that she was eventually diagnosed with MS. Indeed, she was diagnosed with relapsing-remitting MS which, "is characterized by clearly defined attacks of new or increasing neurologic symptoms["]. . . .
>
> . . . .
>
> The ALJ then cited Dr. Salmon's examination on August 9, 2018, wherein Plaintiff reported that she was doing well on her medications, had not fallen, and she felt that her health was under control. The ALJ then stated the "[e]xamination revealed no lumbar spasm, no pedal edema, muscle bulk was normal." Curiously, the ALJ left out *all of the abnormal examination findings*, namely mildly reduced finger tapping and toe tapping on the left compared to the right; reduced hip flexors on left; some patchy diminished sensation in the left lower extremity; slightly widened base gait and mildly unsteady on Romberg testing; and very subtle dysmetria bilaterally. Indeed, every examination performed by Dr. Salmon revealed abnormal findings that support his assessed limitations. . . .
>
> The ALJ also cited a physical therapist note dated April 4, 2018, first noting Plaintiff's complaints, and then stating she "was instructed to do home exercises.

5

Overall, the physical therapist opined the claimant tolerated treatment very well." While the ALJ's summary is accurate as to the two pages of the exhibit that he summarized, this is a highly selective recitation of her physical therapy treatment records. Exhibit 14F contains 56 pages of treatment records spanning from March 2018 to November 2018, which the ALJ never acknowledged or discussed. These records demonstrate that Plaintiff repeatedly became fatigued during therapy sessions, and needed to take rest breaks or skip therapy exercises/activities as a result. . . .

The ALJ also cited to records from early 2019 wherein [Turner-Clewis] reported "feeling good" to her treating providers. The ALJ, however, did not acknowledge that she did complain of fatigue at these appointments. Dr. Salmon specifically assessed multiple limitations based on Plaintiff's fatigue. These complaints of fatigue coupled with the PT records demonstrating that she needed rest breaks due to fatigue support Dr. Salmon's assessed limitations.

The ALJ relied on a highly selective recitation of the underlying record in finding that Dr. Salmon's opinions are "inconsistent" with the underlying record. As just demonstrated, the treatment records after her MS diagnosis support and are consistent with Dr. Salmon's assessed limitations. Notably, no physician has reviewed Dr. Salmon's opinions and opined that his opinions are inconsistent with these treatment records. . . .

Further, as already noted, the record shows that Plaintiff repeatedly complained of fatigue following her MS diagnosis. These records coupled with the PT records demonstrating that she repeatedly needed to take rest breaks due to fatigue support Dr. Salmon's assessed limitations related to fatigue. The ALJ never discussed Plaintiff's well-documented fatigue in the record or provided any explanation as to why her fatigue would not cause her to need unscheduled breaks, be off-task, and/or result in work absences. Instead, the ALJ included in the RFC finding that Plaintiff "can stay on-task to the extent consistent with job duties." The ALJ, however, failed to build any "logical bridge" between the above-described evidence, which supports *only* a finding that Plaintiff's MS symptoms will cause her to need unscheduled breaks or otherwise be off-task or absent from work (as opined by Dr. Salmon), and this conclusion. As a result, the ALJ's RFC finding is not supported by substantial evidence. . . .

The ALJ also failed, more generally, to consider that relapsing-remitting MS is, by definition, a medical condition that causes, at times, increasing neurological symptoms (i.e., relapses), and at other times, little to no neurological symptoms (i.e., remissions). Here, the record demonstrates that Plaintiff suffered a MS relapse that caused her to miss several weeks of PT. The ALJ never

> acknowledged or discussed this evidence, which also supports Dr. Salmon's assessed limitations. . . .
>
> . . . .
>
> In sum, Dr. Salmon's opinions are consistent with and supported by the underlying record; the ALJ's finding to the contrary is not supported by substantial evidence. Again, the only other medical opinion considered by the ALJ was from State Agency nonexamining consultant, Dr. Rowlands, who did not review over 200 pages of the medical records ultimately made part of the record, including the opinions of Dr. Salmon and the nine months of PT records, and who assessed greater limitations than the ALJ ultimately included in the RFC. The ALJ found Dr. Rowlands' opinion to be only "somewhat persuasive", and there can be no reasonable dispute that Dr. Salmon's opinion, which again is consistent with and supported by the record as demonstrated herein, *is at least as persuasive as the ALJ found Dr. Rowlands' opinion to be*. When presented with two equally persuasive opinions, even when their ultimate conclusions are conflicting, the ALJ is required to proceed to the step 2 of the 20 C.F.R. § 404.1520c analysis, which he failed to do. . . .

(Pl.'s Br. at 17-22 (internal citations omitted).)

RFC is what an individual can still do despite his limitations.[2] SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996). It reflects the individual's maximum remaining ability to do sustained work activity in an ordinary work setting on a regular and continuing basis. *Id.*; *see Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001). A regular and continuing basis is an eight-hour day, five days a week, or an equivalent schedule. SSR 96-8p, 1996 WL 374184, at *2. RFC is not the least an individual can do but the most. *Id.* The RFC is a function-by-function assessment, with both exertional and nonexertional[3] factors to be considered, and it is based upon all of the relevant evidence in the case record. *Id.* at 3–6. The responsibility for determining a claimant's

---

[2] The Commissioner's analysis at steps four and five of the disability evaluation process is based on the assessment of the claimant's RFC. *Perez v. Barnhart*, 415 F.3d 457, 461–62 (5th Cir. 2005). The Commissioner assesses the RFC before proceeding from step three to step four. *Id.*

[3] Exertional capacity addresses an individual's ability "to perform each of seven strength demands: Sitting, standing, walking, lifting, carrying, pushing, pulling." SSR 96-8p, 1996 WL 374184, at *5. Each function must be considered separately, but the final RFC assessment may combine activities. *Id.* Nonexertional capacity "considers all work-related limitations and restrictions that do not depend on an individual's physical strength," including mental limitations. *Id.* at *6.

7

RFC lies with the ALJ. *See Villa v. Sullivan*, 895 F.2d 1019, 1023 (5th Cir. 1990). The ALJ must discuss the claimant's ability to perform sustained work activity on a regular and continuing basis and resolve any inconsistencies in the evidence. SSR 96-8p, 1996 WL 374184, at *7.

In making the RFC assessment, the ALJ must consider all symptoms, including pain, and the extent to which these symptoms can be reasonably accepted as consistent with objective medical evidence and other evidence. *See* 20 C.F.R. § 404.1529; SSR 16-3p, 2017 WL 5180304, at *2 (Oct. 25, 2017); SSR 96-8p, 1996 WL 374184, at *5. The ALJ must also consider limitations and restrictions imposed by all of an individual's impairments, even impairments that are not severe. *See* SSR 96-8p, 1996 WL 374184, at *5. The ALJ may draw reasonable inferences from the evidence in making his decision, but the social security ruling also cautions that presumptions, speculation, and supposition do not constitute evidence. *See e.g.*, SSR 86-8, 1986 WL 68636, at *8 (1986), *superseded by* SSR 91-7c, 1991 WL 231791, at *1 (Aug. 1, 1991) (changing the ruling only to the extent the SSR discusses the former procedures used to determine disability in children).

The ALJ is not required to incorporate limitations in the RFC that he did not find the record supported. *See Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991) ("The ALJ as factfinder has the sole responsibility for weighing the evidence and may choose whichever physician's diagnosis is most supported by the record."). In reviewing the ALJ's decision, a finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision. *Boyd*, 239 F.3d at 704.

The ALJ's treatment of medical opinions is governed by the revised rules in 20 C.F.R. § 404.1520c, which apply to claims that were filed after March 27, 2017, such as the claims in the present case. *See Winston v. Berryhill*, 755 F. App'x 395, 402 n.4 (5th Cir. 2018) (citing 20 C.F.R.

404.1520c(a)); *Governor v. Comm'r of Soc. Sec.*, No. 20-54-BAJ-EWD, 2021 WL 1151580, at *6 (M.D. La. Mar. 2, 2021). Pursuant to 20 C.F.R. § 404.1520c(a), the ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [claimant's] medical sources." "When a medical source provides one or more medical opinions[4] or prior administrative medical findings,[5] [the ALJ] will consider those medical opinions or prior administrative findings from that medical source together using the factors listed in paragraphs (c)(1) through (c)(5) of" section 404.1520c(a), as appropriate." 20 C.F.R. § 404.1520c(a) (footnotes added). The ALJ is not required to articulate how he considered each medical opinion or prior administrative medical findings from one medical source individually. 20 C.F.R. § 404.1520c(b)(1).

"The most important factors [the ALJ] consider[s] when [ ]evaluat[ing] the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)." 20 C.F.R. § 404.1520c(a) (footnotes added). "The ALJ must explain the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in his determination, and he

---

[4] Medical opinions are statements from a medical source about what the claimant can still do despite her impairment(s) and whether the claimant has one or more impairment-related limitations or restrictions in certain abilities. These may include claimant's ability to: (i) perform physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching); (ii) perform mental demands of work activities, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting; (iii) perform other demands of work, such as seeing, hearing, or using other senses; and, (iv) adapt to environmental conditions, such as temperature extremes or fumes. *See* 20 C.F.R. § 404.1513(a)(2).

[5] Prior administrative findings are findings other than the ultimate determination about whether the claimant is disabled, about a medical issue made by the Commissioner's federal and state agency medical and psychological consultants at a prior level of review of the claimant's current claim based on their review of the evidence in the case record. Such findings could be on issues including: (i) the existence and severity of the claimant's impairment(s); (ii) the existence and severity of the claimant's symptoms; (iii) statements about whether the claimant's impairment(s) meets or medically equals any listing in the Listing of Impairments in Part 404, Subpart P, Appendix1; (iv) the claimant's RFC; (v) whether the claimant's impairment(s) meets the duration requirement; and (vi) how failure to follow prescribed treatment and drug addiction and alcoholism relate to the claimant's claim. *See* 20 C.F.R. § 404.1413(a)(5).

may, but is not required to, explain how he considered the (c)(3) [through] (c)(5) factors, *i.e.*, relationship with the claimant, specialization, and 'other factors.'" *Governor*, 2021 WL 1151580, at *7.

In this case, the ALJ found, as stated above, that Turner-Clewis had the RFC to perform sedentary work with additional physical and mental restrictions. (Tr. 13.) In making this RFC determination, the ALJ considered, *inter alia*, the examination and treatment notes as well as opinions of multiple doctors, including Dr. Salmon; Michael Ramsey, M.D.; David A. Deems, M.D.; Troy Foster, D.O.; Tuan Du., M.D.; Daniel J. Blackaby, D.O.; Jon Senkowsky, M.D.; Richard M. Roberts, M.D.; Mark E. Tracy, M.D.; Rajiv Dattatreya, M.D.; State Agency Medical Consultant Kim Rowlands, M.D. ("SAMC Rowlands"); Syed Sarmast, M.D.; Steven Robert Reiman, M.D.; and Joanna Geslani, D.O. (Tr. 15-23.) The ALJ also considered the physical therapy notes and reports from Kevin J. Dorf, MPT. (Tr. 19, 22.) As to Dr. Salmon and the weight given to various medical opinions, the ALJ stated, *inter alia*, the following:

> Thomas H. Salmon, M.D., examination report dated September 19, 2017 shows muscle bulk was normal. There was slightly increased tone in both lower extremities. Finger tapping was symmetrical[.] Toe tapping was slowed bilaterally, more so on the left than the right. There was no tremor, fasciculations, or other adventitious/involuntary movements[.] Strength is grade 5 in the upper extremities [and] in the lower extremities, the hip flexors are grade 4 to 4+ on the right and grade 3+ on the left. Knee extension was grade 5 on the right and grade 4 on the left. Knee flexors were grade 4+ on the right and grade 4- on the left. Ankle dorsiflexors were grade 5 on the right and grade 4+ on the left[.] Reflexes are grade 2 in the arms, grade 2 at the right knee, grade 2+ at the left knee, and grade 0 at each ankle. Plantar responses are neutral. She reports paresthesias and reduced sensation in the left hemi body to the upper margin of the scapula. She reports normal sensation in the craniofacial regions on the right side. Her gait has a widened base[.] Romberg was negative. There was some circumduction of the left lower extremity. The claimant had no action tremor or definite cerebellar deficits.
>
> Dr. Salmon added that the claimant presented with a nearly one and a half year history of left-sided sensory symptoms; left greater than right lower extremity weakness that were concerning for a lower cervical or upper thoracic myelopathy.

Potentially based on some mild stenosis, although other lesions within the spinal canal and cord itself were also within the differential diagnosis. This has led to gait difficulties and sensory disturbances in the left greater than right legs that were not improved by a lumbar decompressed procedure last year. Given her examination findings, a hemispheric process seemed less likely. The claimant would refrain from any lifting of more than 5 to 10 pounds or other strenuous physical activity.

. . . .

[Dr. Salmon],[6] the claimant's neurologist, submitted a Multiple Sclerosis Medical Source Statement and Physical RFC Assessment dated March 8, 2018 that reflects the claimant's first visit was September 2017 for diagnosis of multiple sclerosis with fair prognosis. The claimant's symptoms and signs included chronic fatigue, balance problems, paralysis, weakness, sensitivity to heat, unstable walking muscle spasticity, loss of manual dexterity and numbness. In an 8-hour workday, the claimant could sit for 2 hours, stand and/or walk less than 2 hours, and permitted to shift positions at will from sitting, standing or walking. The claimant would need to take unscheduled breaks during the workday four to five times hourly for 15-30 minutes before returning to work. She would need to have use of a cane or other assistive device. The claimant could never lift and carry 10 pounds, never twist, stoop, bend, crouch or squat. The claimant would be off-task 25 percent of the time in an 8-hour workday. Her impairments would likely produce good days and bad days. The earliest date the claimant's symptoms applies was [sic] in September 2017.

. . . .

Dr. Salmon reported the claimant presented August 9, 2018 for a follow up of her relapsing remitting multiple sclerosis, multiple sclerosis-related fatigue, gait difficulties, and fluctuating sensory symptoms. The claimant stated she had been doing well, and reported Ampyra had been beneficial for her fatigue and gait difficulties. She continued with physical therapy, and reported tolerating the Copaxone injection three times per week very well. She reported she had not fallen. The claimant reported she rests well at night. She commented that her health had been under good control. Her interim symptom inventory was otherwise negative. Examination revealed no lumbar spasm, straight leg raising test [was] negative. There was no pedal edema. Muscle bulk was normal. The impression shows relapsing-remitting multiple sclerosis, clinically stable on Copaxone 2 MS-related fatigue and multifactorial gait difficulties, left lower extremity sensory disturbances, stable, and history of hypertension, well controlled.

. . . .

---

[6] The ALJ, in an apparent scrivener's error, indicated that this RFC assessment was written by Mark E. Tracy, who is an attorney (*see* Tr. 10) and not a doctor. However, a review of this RFC assessment, dated March 8, 2018, indicates it was actually written by Dr. Salmon. (Compare Tr. 449-52 with Tr. 758-61.)

11

Dr. Salmon submitted an updated Multiple Sclerosis Medical Source Statement dated March 20, 2019 that shows the claimant's first examination occurred September 19, 2017 for multiple sclerosis[. A]n MRI of the brain confirmed the diagnosis. The claimant's prognosis was fair. The claimant could walk less than one city block, and in an 8-hour workday, she could sit for 2 hours, stand and/or walk for less than 2 hours and would need to shift positions from sitting, standing and walking. She would need to take unscheduled breaks during a workday. The claimant must use a cane or other assistive device due to muscle weakness, chronic fatigue, incoordination, and imbalance. The claimant could never lift and/or carry 20 pounds and rarely lift and/or carry 10 pounds, never crouch or squat. The claimant is likely to be off-task 25 percent or more. She would likely have good days and bad days. The claimant could be expected to be absent more than four days per month due to her impairments or treatment. She would need to avoid exposure to temperature extremes[,] particularly heat. Her symptoms began around 2015.

. . . .

Overall, I note the claimant has been treated for years for lower-extremity symptoms, with some intermittent upper extremity involvement, involving pain and subjective weakness. Although initially treated as cervical or lumbar pain (she even had lumbar surgery), multiple sclerosis was ultimately determined to be the cause of her symptoms. She has received steady care. Two different treating physicians have provided clearly disabling RFC assessments. However, the treatment record and objective evidence does not justify the less-than-sedentary RFC assessments offered by these sources. Despite some references to upper extremity symptoms, the treatment records clearly focus on the claimant's lower extremities and strength has typically been 5/5. The restrictions to virtually no handling, fingering are not well-supported and are in fact inconsistent with the evidence.

I note that the claimant appears to have stopped working because of layoffs, not due to her impairments. The most recent evidence seems to document that the claimant is doing fairly well. In January 2019, the claimant reported that she was feeling good. For example, on February 5, 2019, the claimant was "healthy" and "feeling good"; had not had any recent falls; and had full strength on examination. In March 2019, the claimant reported that she had morning stiffness for about 15 minutes, but then was able to get up and go.

. . . .

I considered the DDS physical RFC assessment by Dr. Rowlands who noted evidence of record in July 2017 showed the claimant had normal range of motion, exhibited edema, no tenderness or deformity, and trace left leg edema. Medical evidence of record reflects a physical examination March 9, 2018 showed the back had full range of motion, knee joint tenderness noted but full range of motion and

> strength. Sensation was intact and she had antalgic gait. I find the non-examining source opinion somewhat persuasive.
>
> I considered Dr. [Salmon's] Multiple Sclerosis Medical Source Statement and Physical RFC Assessment dated March 8, 2018. I find the opinion unpersuasive for the reasons discussed above. In brief, the opinion is not consistent with the longitudinal medical evidence and some of the limitations appear wholly unsupported.
>
> I also considered Dr. Salmon's opinion. I find the opinion unpersuasive because it is inconsistent with the medical evidence discussed above. I also note that Dr. Salmon linked some of his limitations to 2015, when the claimant was apparently still working full-time. Such a glaring inconsistency with the record undermines the basis for Dr. Salmon's opinion as a whole.
>
> In summary, the residual functional capacity assessment is based on the claimant's treatment records and the opinions of the State agency experts.

(Tr. 17-23 (internal citations omitted).)

As noted above, the ALJ is responsible for assessing a claimant's RFC based on all the relevant evidence in the record. 20 C.F.R. § 404.1546(c). If substantial evidence in the record supports an ALJ's determination of a claimant's RFC, there is no reversible error. *See Gutierrez v. Barnhart,* 2005 WL 1994289, at *7 (5th Cir. Aug. 19, 2005). At issue here is the ALJ's treatment of the medical opinions of Dr. Salmon. In this case, there are several medical opinions that assess the effects of Turner-Clewis' functional impairments on her ability to work. The ALJ, in making his RFC determination, dedicated multiple pages to considering and analyzing the medical and other evidence in the record. Even assuming, without deciding, that the ALJ was required to evaluate Dr. Salmon's opinions using all five factors set forth in 20 C.F.R. 404.1520c(c)(3), the Court finds that the ALJ did so. As to factors (c)(1) and (c)(2), which look at supportability and consistency, the ALJ noted that Dr. Salmon's RFC assessments were not consistent with the treatment records and objective evidence nor well-supported. (Tr. 22, 23.) As to factor (c)(3), which evaluates relationship between the medical source and the claimant, the ALJ noted that Dr.

Salmon was one of Turner-Clewis' treating physicians (Tr. 22) and analyzed multiple occasions when Salmon examined Turner-Clewis, including on September 19, 2017 and August 9, 2018 as well as two RFC assessments dated March 8, 2019 and March 20, 2019 (Tr. 17-21). As to factors (c)(4) and (c)(5), which looks at the specialization of the medical source and "other factors" such as familiarity with the other evidence, the ALJ also noted that Dr. Salmon was Turner-Clewis' neurologist and analyzed evidence from multiple other medical sources. (Tr. 17.)

Based on the foregoing, the Court finds that the ALJ properly considered the evidence as a whole, utilizing not only parts of the opinions in the record, but also the other medical evidence in the record, including Dr. Salmon's opinions, to determine Turner-Clewis' RFC. The ALJ discussed the evidence in the record in making his RFC determination, adequately explained the reasoning for such determination and for giving less weight to certain evidence and exercised his responsibility as factfinder in weighing the evidence and in choosing to incorporate limitations into his RFC assessment that were most supported by the record. *See, e.g., Muse,* 925 F.2d at 790. The ALJ properly weighed Dr. Salmon's opinions against the other evidence and the record as a whole. The "ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion." *Moore v. Saul*, No. 3:20-cv-48-DPJ-MTP, 2021 WL 909618, at *6 (N.D. Tex. Feb. 1, 2021). Because there is substantial evidence in the record that supports the ALJ's RFC determination and the ALJ properly considered Dr. Salmon's opinions, remand is not required.

## B. Credibility[7]

In her brief, Turner-Clewis also argues that the ALJ's credibility determination is defective because the ALJ failed to consider Turner-Clewis' stellar work history in the ALJ's credibility assessment.[8] (Pl.'s Br. at 23-25.) In support of this argument, Turner-Clewis states, *inter alia*:

> Agency policy set forth in 20 C.F.R. § 404.1529(c)(3) and SSR 16-3p requires that a claimant's demonstrated willingness to work be considered as part of a credibility assessment. Case law has long recognized the regulatory and rational basis for this requirement; the courts that have so held have reasoned that it is unlikely someone would trade in their productive, and lucrative, work career for the far less lucrative "career" of receiving disability benefits. To be clear, Plaintiff is not suggesting that her strong work history *necessarily* entitles her to enhanced credibility, or that this factor trumps others. She simply argues that (1) the ALJ was required to consider this highly relevant credibility factor, and (2) he did not.

(Pl.'s Br. at 24 (footnote omitted) (internal citations omitted).)

In evaluating a claimant's subjective complaints, the ALJ first considers whether there is a medically determinable impairment that could reasonably be expected to produce the claimant's symptoms. 20 C.F.R. § 404.1529(b); SSR 16-3P, 2017 WL 5180304, at *3. Once he finds impairment, the ALJ evaluates the intensity, persistence, and limiting effects of the symptoms on the claimant's ability to do basic work activities. 20 C.F.R. § 404.1529(c); SSR 16-3P, 2017 WL 5180304, at *4. A claimant's statements about pain and other symptoms are not conclusive evidence of disability, but must be accompanied by medical signs and findings of a medical

---

[7] Turner-Clewis sets forth several reasons why the word "credibility" should not be used and that, instead, pursuant to SSR 16-3p, "the *exclusive* consideration of the ALJ should be whether the claimant's self-described limitations are consistent with the evidence." (Pl.'s Br. at 23.) The Court notes that, effective March 16, 2016, the SSA eliminated "use of the term 'credibility' from [its] sub-regulatory policy," clarifying "that subjective symptom evaluation is not an examination of an individual's character." SSR 16-3p, 2017 WL 5180304, at *2. However, the Court will use the word "credibility" as it is in common usage but will focus on the requirements of the regulations and statutes in evaluating the claimant's self-described limitations.

[8] The Court notes that Turner-Clewis also argues that the ALJ's credibility analysis was defective because of the ALJ's previously discussed errors in formulating the RFC determination and evaluating the medical evidence in the record. (Pl.'s Br. at 23-24.) Because the Court already determined that the ALJ did not err in the RFC determination or in evaluating the medical evidence in the record, the Court will not consider such argument.

15

impairment that could reasonably be expected to produce the pain or other symptoms alleged and that would lead to the conclusion that she is disabled. 42 U.S.C. § 423(d)(5)(A). A claimant's testimony must be consistent with the objective medical evidence and other available evidence. 20 C.F.R. § 404.1529.

In all cases in which pain or other symptoms are alleged, the administrative decision must contain a thorough discussion and analysis of both the objective medical and other evidence in the record, including the individual's complaints of pain or other symptoms and the adjudicator's own observations. SSR 16-3P, 2017 WL 5180304, at *10-11. When assessing the credibility of an individual's statements, the ALJ considers, in addition to the objective medical evidence, the following: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, which the claimant receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the claimant uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the claimant's functional capacity, limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3); SSR 16-3P, 2017 WL 5180304, at *7-8. An ALJ's unfavorable credibility evaluation will not be upheld on judicial review where the uncontroverted medical evidence shows a basis for the claimant's complaints unless the ALJ weighs the objective medical evidence and articulates reasons for discrediting the claimant's subjective complaints. *Abshire v. Bowen*, 848 F.2d 638, 642 (5th Cir. 1988); *see Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994).

In evaluating Turner-Clewis' credibility, the ALJ first set out the standard for evaluating Turner-Clewis' credibility. (Tr. 13-14.) Then, the ALJ stated:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.
>
> . . . .
>
> As for the claimant's statements about the intensity, persistence, and limiting effects of his or her symptoms, they are inconsistent with the evidence as a whole because Dr. Foster's examination report dated May 10, 2017 shows lumbosacral spine had no lesions or deformities. There was decreased range of motion secondary to pain. Straight leg raising test was negative. Right hip had no tenderness to palpation. Range of motion was without difficulty, pain or crepitus. The claimant's nerve conduction studies were within normal limits. . . .

(Tr. 21.) In making this determination, the ALJ carefully analyzed all the evidence in the record, including the medical evidence and other evidence in the record and Turner-Clewis' own testimony. (Tr. 13-24.) In addition, the ALJ considered numerous other factors, as required, in making his credibility decision, including Turner-Clewis' daily activities, her multiple sclerosis, the pain in her neck, back, left leg, joints, and groin, her use of a cane and walker, her medications, and other treatments such as injections and physical therapy. (*Id.*)

In addition, contrary to Turner-Clewis' claims, the ALJ was aware of Turner-Clewis' "demonstrated willingness to work." For instance, the ALJ stated:

> The claimant worked after the alleged disability onset date but this work activity did not rise to the level of substantial gainful activity. In 2017, the claimant reported her earnings totaled $7,246.51. The 2017 national SGA for non-blind SGA was $1,170 per month or $14,040 total. I have, however, considered the claimant's work activity throughout the sequential evaluation process.
>
> . . . .

> I note that the claimant appears to have stopped working because of layoffs, not due to her impairments. . . .
>
> . . . .
>
> The vocational expert testified the claimant's past work was an accounting clerk . . . and collection clerk . . . .
>
> Based on the claimant's earnings summary, work history and vocational expert testimony, I conclude the above jobs meet criteria for past relevant work.

(Tr. 12, 22-23.) While not all references to Turner-Clewis' work history were made during the credibility determination, it is obvious that the ALJ was aware of Turner-Clewis' work history during all parts of the disability determination, including the credibility determination. Moreover, as stated by Turner-Clewis, work history is one of several factors for the ALJ to consider and any error by the ALJ, if any, in fully considering Turner-Clewis' strong work history is harmless as substantial evidence supports the ALJ's credibility determination.[9] Thus, remand is not required on this basis.

## RECOMMENDATION

It is recommended that the Commissioner's decision be **AFFIRMED**.

### NOTICE OF RIGHT TO OBJECT TO PROPOSED FINDINGS, CONCLUSIONS, AND RECOMMENDATION AND CONSEQUENCES OF FAILURE TO OBJECT

Under 28 U.S.C. § 636(b)(1), each party to this action has the right to serve and file specific written objections in the United States District Court to the United States Magistrate Judge's proposed findings, conclusions, and recommendation within fourteen (14) days after the party has

---

[9] In addition, the Court notes that there does not appear to be any controlling Fifth Circuit cases requiring consideration of a "strong work history" to determine a plaintiff's credibility. *Garner v. U.S. Comm'r Soc. Sec. Admin*, No. 1:17-CV-01084, 2019 WL 1088408, at *14 (W.D. La. Feb. 19, 2019). *See also Roberson v. Colvin*, No. , 2015 WL 1408925, at * (N.D. Tex. Mar. 27, 2015) ("[W]hile it may have been better for the ALJ to acknowledge plaintiff's 30-year consistent work history, the failure to reference such in his findings does not mean he was not aware of the history.")

been served with a copy of this document. The United States District Judge need only make a de novo determination of those portions of the United States Magistrate Judge's proposed findings, conclusions, and recommendation to which specific objection is timely made. *See* 28 U.S.C. § 636(b)(1). Failure to file by the date stated above a specific written objection to a proposed factual finding or legal conclusion will bar a party, except upon grounds of plain error or manifest injustice, from attacking on appeal any such proposed factual findings and legal conclusions accepted by the United States District Judge. *See Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc).

## ORDER

Under 28 U.S.C. § 636, it is hereby **ORDERED** that each party is granted until **June 2, 2021**, to serve and file written objections to the United States Magistrate Judge's proposed findings, conclusions, and recommendation. It is further **ORDERED** that if objections are filed and the opposing party chooses to file a response, the response shall be file within seven (7) days of the filing date of objections.

It is further **ORDERED** that the above-styled and numbered action, previously referred to the United States Magistrate Judge for findings, conclusions, and recommendation, be and hereby is returned to the docket for the United States District Judge.

SIGNED May 19, 2021.

JEFFREY L. CURETON
UNITED STATES MAGISTRATE JUDGE